UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| OLIVER H. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00128-JRS-MKK |
| | ) | |
| ROARK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING STATE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Oliver Williams is an Indiana Department of Correction (IDOC) inmate. He brings this civil rights action pursuant to 42 U.S.C. § 1983 based on allegations that while at Wabash Valley Correctional Facility (Wabash Valley), that state defendants used excessive force against him on August 8, 2020. The state defendants seek summary judgment on all claims.

For the reasons explained below, the state defendants' motion, dkt. [77], is **GRANTED**. **The clerk is DIRECTED** to enter final judgment. The Court **VACATES** the final pretrial conference and trial dates.

**I. Preliminary Matters**

For clarity of the record, the Court acknowledges what briefing it considered in issuing this ruling. The Court considered the state defendants' motion for summary judgment (docket 77), their brief and memorandum in support (docket 79), their designation of evidence (docket 78), and their reply brief (docket 95).

The Court considered Mr. Williams' response in opposition (docket 89), his memorandum of law (docket 90), and his designated evidence (docket 91). Mr. Williams was permitted an extension of time, through June 23, 2023, to oppose state defendants' motion for summary

1

judgment. Dkt. 88 (Order granting plaintiff's motion for extension of time). Mr. Williams timely submitted his response entitled "Response to Defendants' Motion for Summary Judgment." Dkt. 89. Yet in that response, he moves the Court "to grant a summary judgment in" his favor. *Id.* And, his memorandum of law states it is "in support of summary judgment." Dkt. 90. But the deadline for the parties to file motions for summary judgment was April 26, 2023, and Mr. Williams did not move to extend that deadline to file a cross-motion. Dkt. 52. Rather, he moved for an extension of time after the dispositive motion deadline passed and the state defendants moved for summary judgment, and his request was only for more time to respond to their motion. Dkt. 87 (plaintiff's motion for extension of time filed May 9, 2023). Thus, the Court construes Mr. Williams' filings as his response in opposition and supporting materials, and not a cross-motion for summary judgment.

The Court also notes that Mr. Williams filed a "response in opposition to defendant's reply" which was docketed as a surreply on August 2, 2023. *See* dkt. 100. The Court has reviewed that filing, and Mr. Williams makes a general request for time to identify or present evidence to dispute material facts because the facility had been on lockdown. *Id.* Any request for additional time to present evidence to the Court is untimely. Discovery closed in March 2023, and in its Order granting Mr. Williams more time to respond to the state defendants' summary judgment motion, the Court informed Mr. Williams that it anticipated no further extensions of the deadlines for the remaining briefing. Dkt. 88. This matter is now ripe for the Court's resolution.

## II. Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way to resolve a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute over any of the material facts, and the moving party is entitled to judgment as a

matter of law. *Id.*; *Pack v. Middlebury Comty. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

This case relates largely to Mr. Williams' allegations that state defendants used excessive force on him on August 8, 2020. The summary judgment record contains video of the incident. Further, "where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court

3

should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

### III. Facts

Because the state defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The following statement of facts has been evaluated under the standard above. The facts are considered undisputed except where disputes of fact are noted.

#### A. The Parties

Mr. Williams is an IDOC inmate, and at all times relevant to his claims, he was housed at Wabash Valley. Dkt. 1 (plaintiff's complaint). At all relevant times, the state defendants were employed by the IDOC and held the ranks of either officers, sergeants, lieutenants, or captains at Wabash Valley. Dkts. 78-1, 78-2, 78-3, 78-4, 78-5, 78-6, 78-7 (state defendants' Affidavits).

#### B. August 8, 2020, Incident—*Defendants Tovar, Roark, Leffler, R. Brewer, and Ashba*

##### 1. Defendants' Affidavits and Medical Record

At about 8:28 p.m. on August 8, 2020, Officer Tovar called a Signal 10 on the right wing of the F Housing Unit at Wabash Valley. Dkt. 78-1, ¶ 5 (Roark Affidavit). "A Signal 10 generally means that an officer needs immediate assistance." *Id.* Sgt. Roark responded to assist Officer Tovar and observed Mr. Williams "moving around erratically." *Id.*, ¶ 6; dkt. 78-3, ¶ 9 (R. Brewer Affidavit). At some point, Mr. Williams moved "underneath the stairs near the fire door," and the Quick Response Team (QRT) arrived in response to the Signal 10. Dkt. 78-1, ¶ 7. Sgts. R. Brewer,

Leffler, and Ashba were members of the QRT. *Id.*; dkt. 78-2, ¶ 8 (Leffler Affidavit); dkt. 78-3, ¶ 7; dkt. 78-5, ¶ 7 (Ashba Affidavit).

"Williams was told several times to get on the ground and submit to mechanical restraints, but Williams did not comply with those orders." 78-1, ¶ 8; dkt. 78-2, ¶ 10 (Leffler heard Roark giving verbal commands. "It appeared to me at this time that Williams was intoxicated or under the influence of drugs."); dkt. 78-3, ¶ 10 (R. Brewer heard Roark giving verbal commands to "stop acting erratically and submit to restraints."); dkt. 78-5, ¶ 11 (Ashba attests "my fellow officers and I gave Williams orders such as 'give me your hands' and 'stop resisting.'"). Rather, Mr. Williams "got in a defensive position and lunged at Brewer and Leffler," and he struck Sgt. Leffler "on the top of the head causing a small laceration." Dkt. 78-1, ¶ 10; dkt. 78-2, ¶ 11; dkt. 78-3, ¶ 11; dkt. 78-5, ¶ 9.

Sgt. Roark "deployed one cartridge from an X2 taser at Williams, striking the offender on the right side of his chest," due to his "disobeying orders, resisting being restrained, and attacking responding officers." Dkt. 78-1, ¶ 10. Mr. Williams at first fell down, but then "attempted to return to his feet in an aggressive manner and then lunged at Brewer again." Dkt. 78-1, ¶ 11; dkt. 78-5, ¶ 12. When Mr. Williams lunged, he tore the lapel of Sgt. R. Brewer's shirt where the radio was fastened. Dkt. 78-3, ¶ 13.

Sgts. Ashba and Leffler administered a "one second burst of oleoresin capsicum ("O.C.") spray to Williams' targeted area," but he was still noncompliant. Dkt. 78-1, ¶ 12; 78-2, ¶ 14 (Leffler attests that the taser was ineffective and "Williams continued to aggressively lunge at us[.]"); dkt. 78-3, ¶ 14; dkt. 78-5, ¶ 13. He continued through the fire door of the unit "and fell to the ground on the sidewalk outside." Dkt. 78-1, ¶ 13; dkt. 78-3, ¶ 15; dkt. 78-5, ¶ 14. It appeared to Sgts. Leffler and Ashba that when Mr. Williams fell, he bit his tongue. Dkt. 78-2, ¶ 15; dkt. 78-5, ¶ 14.

Mr. Williams again attempted to return to his feet, and out of concern for the safety of the responding officers, Sgt. Roark "reenergized the taser cartridge one time to try to gain compliance[.]" Dkt. 78-1, ¶ 15; dkt. 78-2, ¶¶ 16-17; dkt. 78-5, ¶¶ 15-16. After all of this, Sgts. Leffler and R. Brewer applied mechanical restraints to Mr. Williams, and they sat him up, and waited for medical staff to arrive at the scene. Dkt. 78-1, ¶ 16; dkt. 78-2, ¶ 18; dkt. 78-3, ¶ 18; dkt. 78-5, ¶ 17.

Then, Sgt. Ashba administered one dose of nasal Narcan to Mr. Williams because he "displayed signs of extreme intoxication and began to lose consciousness." Dkt. 78-1, ¶ 17; dkt. 78-2, ¶ 18; dkt. 78-3, ¶ 19; dkt. 78-5, ¶ 18 ("Concerned for his health, I administered one dose of nasal Narcan to Williams."). When Nurse Taggart arrived, she recommended that Mr. Williams be taken to the infirmary in a wheelchair, and Sgts. R. Brewer and Leffler "assisted Williams into a wheelchair" for transport. Dkt. 78-1, ¶ 18; dkt. 78-2, ¶¶ 20-21; dkt. 78-3, ¶¶ 20, 22; dkt. 78-5, ¶¶ 19-20. At this time, Sgt. R. Brewer observed Mr. Williams "kicking his legs around in an aggressive manner," and Sgts. Leffler and R. Brewer applied leg restraints in an attempt to gain compliance. Dkt. 78-3, ¶ 21. Sgt. R. Brewer then started pushing Mr. Williams in the wheelchair but "[a]bout 10 or 15 seconds later Williams suddenly planted his feet on the ground and jumped out of the wheelchair," and he struck his face on the ground. Dkt. 78-3, ¶ 23; dkt. 78-1, ¶ 20; dkt. 78-2, ¶ 22; dkt. 78-5, ¶¶ 20-21.[1] Sgt. Ashba called for a gurney, and Mr. Williams was transported to the infirmary. Dkt. 78-2, ¶ 23; dkt. 78-3, ¶ 24; dkt. 78-5, ¶ 22.

---

[1] Mr. Williams points out that the investigation report from his prison disciplinary case indicates that Sgt. Roark was "turned halfway" and "didn't see exactly how he fell," out of the wheelchair. Dkt. 91-1 at 39. The Court does not find a genuine issue of material fact here, as multiple witnesses aside from Sgt. Roark attested to Mr. Williams planting his feet, lunging, and causing himself to fall out of the wheelchair.

The state defendants designated Mr. Williams' August 8, 2020, medical record as evidence accompanying their motion for summary judgment. *See* dkt. 78-11 at 1-4. Nurse Taggart was dispatched to the scene after a taser and chemical agent were used on Mr. Williams, and she treated him in the infirmary. *Id.* The medical record includes her notes, assessment, and treatment provided. *Id.* Her notes reflect that when Mr. Williams arrived in the infirmary, he made the statements that he was "higher than a bitch," "higher than a motherfucker," had high blood pressure, and needed a drink of water.[2] *Id.* Nurse Taggart noted that when she arrived at the scene Mr. Williams "was sitting upright on sidewalk, cuffed from behind, with blood on face. Offender appeared under the influence of something. Vital signs taken, offender had low O2 and low pulse registering on pulse ox." *Id.* Narcan was administered at the scene by custody staff, and Nurse Taggart requested Mr. Williams be transported to the infirmary. *Id.* During transport in the wheelchair, "offender lunged forward and fell out of wheelchair onto sidewalk," so he was secured in a gurney for the final transport. *Id.* The medical record reflects Mr. Williams vomited several times,[3] admitted to drinking alcohol and would not tell staff what, if any, other substances he had taken. *Id.* Narcan was administered two more times by a nurse in the infirmary. *Id.* Nurse Taggart treated Mr. Williams by applying steri-strips to a laceration above his left eyebrow, and she noted an abrasion to his left check and that the "tip of his tongue appears to have been bitten by offender's teeth." *Id.* Other than redness to his eye, the medical record does not indicate further injury. *Id.*

---

[2] Mr. Williams disputed the context of these statements in his deposition, testifying that he said he had "high blood pressure" and that he was, "hot," not "high." Dkt. 78-10 at 17. (plaintiff's deposition). Mr. Williams admitted drinking alcohol earlier that day that he got from another offender and smoking a cigarette, but he testified that he did not believe he was drunk and did not use drugs. *Id.* at 19, 44-46. He admitted he knew alcohol use could negatively affect his blood pressure and that he was aware that high blood pressure could be a cause of chest pain. *Id.* at 31-32.

[3] Mr. Williams disputes that he was vomiting, rather, he testified at his deposition that he was spitting the blood out of his mouth from his tongue injury and spitting because of exposure to the chemical agent. Dkt. 78-10 at 18-19.

Mr. Williams was given four liters of oxygen and was monitored for an hour in the infirmary until his condition was stable and he could be returned to the restrictive housing unit. *Id.* Nurse Taggart emailed Dr. Byrd about the incident and treatment she provided, and he directed no further orders for different or additional treatment. *Id.*

Sgt. R. Brewer stayed with Mr. Williams in the infirmary while he was evaluated and treated by medical staff, and he heard Mr. Williams state that he was high. Dkt. 78-3, ¶ 25. Once Mr. Williams was released from the infirmary, Sgt. R. Brewer escorted him to get a decontamination shower in the DHU Segregation Wing. Dkt. 78-3, ¶ 26 ("I was present and supervised Williams receiving a shower in a shower stall with running water."). Sgt. Ashba was assigned to the DHU and attests that when Mr. Williams arrived there from the infirmary, he was given a decontamination shower without incident and was taken to the Special Confinement Unit (SCU). Dkt. 78-5, ¶¶ 23-25.

Sgts. Roark, Leffler, and R. Brewer attest that they did not "punch, strike, choke, or kick" Mr. Williams during the incident, nor did they witness any of the other responding officers doing so. Dkt. 78-1, ¶ 23; dkt. 78-2; dkt. 78-3, ¶ 27; dkt. 78-5, ¶ 26. It was the responding officers' impression that Mr. Williams was not trying to request medical care during the incident. Dkt. 78-1, ¶ 24; dkt. 78-2, ¶ 25; dkt. 78-3, ¶ 28; dkt. 78-5, ¶ 27.

### 2. Mr. Williams' Account

Mr. Williams attests that on August 8, 2020, he experienced chest pain that felt like he was having a stroke, and he informed Officer Tovar, the officer working in the general population F-Cell house he was on. Dkt. 91-1, ¶ 2 (plaintiff's Affidavit); dkt. 78-10 at 45. Officer Tovar told him to fill out a healthcare request form. Dkt. 91-1, ¶ 2. Mr. Williams attests that in a panic, he took Officer Tovar's hat off his head and backed away. *Id.*, ¶ 3. "Other guards came and used

excessive force while I was restrained and cuffed, causing lacerations to my wrist, head trauma, and a hole in my tongue due to having a mild seizure. I passed out and experience short term memory loss." *Id.* He attests he did not receive "a proper decontamination shower,"[4] that he was given a disciplinary conduct report for assault on one of the guards, and that he still experiences "chest pain, head pain, and memory loss, and what appears to be nerve damage in my tongue, wrist, and ankle." *Id.*, ¶¶ 4-6.

The record also includes documents Mr. Williams submitted in a letter to the Court on December 1, 2021. *See* dkt. 39; dkt. 39-1. These documents included Mr. Williams' grievances related to the August 8, 2020, incident. Dkt. 39-2 at 1-15. The Court notes that in Mr. Williams' signed formal Grievance No. 116615, filed on August 11, 2020, three days after the use of force incident, Mr. Williams wrote, in relevant part:

> On August the 8th, 2020 at or around 8:05 P.M. during FHU indoor recreation as the doors began to secure, I ran back to the cell to watch T.V. As I entered within the cell, I began to have chest pains. I did not associate the chest pains with being under the influence because these medical problems have been an ongoing thing. As often, I'd take a knee, gather myself, say a short prayer and breathe. **The last thing I remember, is attempting to take a knee within the cell. Only to regain full consciousness within the infirmary surrounded by staff telling me to take it easy, relax.**[5] The left side of my face was bruised . . . my left front tooth was loose, I pierced my tongue, as if I suffered a mild stroke or seizure. Along with bruising to my left knee and wrist burns from the cuff restraints, I was maced and tased. I asked, 'what was going on, why I was cuffed and scared?' The Nurse stated that I was found unresponsive within the cell. Lt. Lundy made the comment that I assaulted an Officer. Which knowingly and intentionally, **I do not recall any such things of said incident!** . . . .

---

[4] Mr. Williams testified in his deposition that he was given a decontamination shower after his release from the infirmary, but that he was showered in his clothing and the shower "only agitated things even worse." Dkt. 78-10 at 21, 105. He testified he received this shower about 15 minutes after leaving the infirmary. *Id.* at 104, 106.

[5] In his response brief, Mr. Williams also admits that when he was in his cell, prior to his interaction with Officer Tovar, "he was not coherent enough to make such a request for medical assistance." Dkt. 90 at 2.

*Id.* at 2 (cleaned up, emphasis added); *see also* additional grievance documents at dkt. 41-5 at 1-14 (Sgt. Drogich's partial motion for summary judgment on exhaustion). In an August 16, 2020, response to a return of his grievance, Mr. Williams wrote: "This is an issue with medical that also ended up an issue with custody because **I do not recall the events that led to being maced, tased, and battered.**" *Id.* at 3, 5 (cleaned up, emphasis added). In Mr. Williams' grievance appeal, he wrote: "After the brief conversation with Officer Tovar, my behavior was clearly out of the ordinary. Moments later I was surrounded by officials, **told to 'get on the ground,'** and excessive force was used." *Id.* at 11 (emphasis added). He also wrote that he was cuffed out of view of the camera and the officers beat him unconscious. *Id.*

Mr. Williams' deposition was held on February 8, 2023. In several places in that testimony Mr. Williams lacked recall of the events, and in other places he testified he remembered certain aspects of it. For example, Mr. Williams testified he "was unconscious," and "was in and out, fading," so he could not identify when he saw medical staff during the incident, he did not recall administration of any of the doses of Narcan, and he did not recall the gurney transport to the infirmary, or if he was resisting or not, once on the gurney. Dkt. 78-10 at 16-17, 51, 121. He stated his unconscious state was "because of the excessive force," and he believed it to be from the taser because the taser was reenergized. *Id.* at 17, 59. He testified he was "unconscious for awhile" and "[came] to in the wheelchair." *Id.* at 59. He said he "vaguely" recalled being transported in the wheelchair but remembered being pushed out of it by Sgts. R. Brewer or Leffler. *Id.* at 18. Mr. Williams testified he "didn't know what they could have possibly been doing but he was pushing me in a manner that was not caring and it was rough." *Id.* at 119. When asked to describe his injuries, Mr. Williams testified that his injuries included the laceration above his left eyebrow, the abrasion on his left cheek, a hole in his tongue, an abrasion around his wrist from the handcuffs,

and a left eye injury. *Id.* at 22-23 ("That day was very traumatizing to me. There was a lot going on, so I don't know how that occurred."), 63 ("Well, I could have been punched[.]"), 63 ("I don't know how these injuries occurred all to my face, but like I said, the incident happened so quickly."). In places of his deposition, Mr. Williams acknowledges he was ordered to cuff up at times, but then in other places, does not recall what the officers were saying to him or when they gave him orders. *Id.* at 42, 56-58, 60, 95.[6]

When asked about the lack of recollection he noted in his grievance documents, Mr. Williams testified that at that time, he could not recall the events because the excessive force was so bad, because of head trauma from the incident and "early stages of brain damage," but he admitted that this was just his "belief," and that no medical professional had diagnosed him with brain damage. *Id.* at 49-50, 52.

Mr. Williams then testified he did not lunge at the officers, that he did not strike Sgt. Leffler above the eye, and that he did not swing or kick at any of the officers. *Id.* at 80-82, 93, 95-96. He testified he disagreed with the officers' account that he was "combative," but he did not dispute that he got back up after he was tased. *Id.* at 81, 83. He testified that "an extreme amount of OC" spray was used. *Id.* at 92 (Between the two officers who sprayed him, "that was excessive. Like, they didn't have to use as much as they did. The big cans of Mace, whatever the stuff, that stuff was hot."). He recalled "going through the fire door in a rough manner, being placed through the fire door roughly." *Id.* at 82-83. Mr. Williams recollected other events that it appears he contends happened after he went through the fire door and outside. Such as after he was initially tased and

---

[6] The Court does not identify a material issue of fact as to whether the officers gave Mr. Williams verbal warnings, despite his convoluted testimony, because his own documents indicate they did, and in his inmate witness declarations, a witness stated that Mr. Williams was tased "because he wasn't doing what they asked." Dkt. 91-1 at 25 (Newbold Declaration).

subsequently maced, he testified that the defendants "had their way with him outside." *Id.* at 53. He testified that he "believed" Sgt. R. Brewer stepped on the back of his head, and he was stepped on to the point of unconsciousness, and that the guards beat him up and jumped him. *Id.* at 64, 66, 69. Further, that the officers used their fists and their feet, that Sgt. R. Brewer kicked him in the face, and that Sgt. R. Brewer choked him for an unknown duration even though he was telling him he couldn't breathe.[7] *Id.* at 66, 68-69, 84, 87, 97, 100. He admits that during this time he says he was choked, his feet were not restrained, and he does not remember when his feet were cuffed. *Id.* at 85-86. But, he then states he "was out conscious" and "[came] to sitting up," and Sgt. Ashba was doing something with his face—presumably when Sgt. Ashba administered the first dose of Narcan. *Id.* at 87, 101. He testified Sgt. R. Brewer put his wrist restraints on too tight which caused abrasions, but he admitted that he did not tell Sgt. R. Brewer the restraints hurt him. *Id.* at 99.

Mr. Williams includes declarations from other inmates who were on the same housing units the day of the incident and after the incident, and photographs of his face, tongue, and what appears to be his chest, in his designated evidence. Dkt. 91-1 at p. 21-31. The declarations state that other inmates observed Mr. Williams behaving out of the ordinary, but they did not see him strike the officers and heard him concede "I give, I give," and that force was used on him without provocation. *Id.* at 21-28. In one of the declarations, an inmate who was in the SCU, after Mr. Williams was placed there after the incident attested that three days after the incident, he heard Sgt. Leffler tell Mr. Williams that Williams "didn't punch him and that he only lunged at him and

---

[7] Mr. Williams admitted he was not sure how this was possible. *See* dkt. 78-10 at 89-90:

> Q: "[J]ust talking about basic human anatomy, do you think Sergeant Brewer could have been on your back in that position he was in and have kicked you with his own foot in your face?
>
> A: I don't know. I don't think so. He had to be amazing.

was tasered and he only broke his Oakley sunglasses." *Id.* at 24 (Hunter Declaration). Mr. Williams testified at his deposition that he was harassed by Sgt. Leffler who told him he was going to pay for his Oakley glasses, "[s]o possibly during the incident, his Oakley glasses that were broken, that may have agitated him." Dkt. 78-10 at 62. Again, Mr. Williams testified that he had no recollection of hitting Sgt. Leffler or knocking his glasses off, and further that he doesn't know exactly what role Sgt. Leffler played in the incident. *Id.* at 80, 91-95 ("I know for sure, like I said, with the Mace and with the roughhouse, and not knowing what role he played. But it should come out eventually."), 96 ("[I]t is a possibility that during them getting me restrained, his glasses came off his head, scratched his head, and his glasses broke.").

Mr. Williams also included documentation from his prison disciplinary case, WVS 20-08-0006, related the use of force incident. Dkt. 91-1 at p. 34-41.[8] Mr. Williams testified at his deposition that he was found guilty in his prison disciplinary case, and that the state brought charges against him.[9] Dkt. 78-10 at 38.

The Court takes judicial notice that Mr. Williams was charged with battery against a public safety official—Sgt. Leffler—in Indiana cause No. 77C01-2009-F6-000546, related to the events of August 8, 2020. *See, e.g.*, *Spiegel v. Kim*, 952 F.3d 844, 847 (7th Cir. 2020) (courts may take judicial notice of public records, such as state court documents). The Court notes that *after* he filed

---

[8] These documents indicate that the report of investigation and other documents from Mr. Williams' prison disciplinary case were forwarded to the Sullivan County Prosecutor's Office. Dkt. 91-1 at 38-41. The report of investigation, an exhibit in Mr. Williams' designated evidence, specified that when Mr. Williams was interviewed by the investigating officer, *he had no recollection* of what happened past 8:05 P.M. on August 8, 2020, *from the last time he was in his cell until the time he woke up in the infirmary*, admitting that he had been drinking "hooch" and had smoked something. *Id.* The Court notes that this document indicates that the investigating officer conducted an audio/video recorded interview after Mr. Williams was read his Miranda rights, and that he could not recall anything past 8:05 p.m. on the date of the incident and only remembered waking up in the infirmary. *Id.* at 41.

this civil action on March 3, 2021, but *before* he was deposed, Mr. Williams pleaded guilty to battering Sgt. Leffler, pursuant to a plea agreement in that Indiana cause No. 77C01-2009-F6-000546, and he was sentenced on January 5, 2022.

### 3. *In Camera* Review of Video

In this case, the Court had the benefit of reviewing *in camera* a video recording of the incident that forms the factual basis of Mr. Williams' claims. *See* dkt. 86. The video does not contain audio. The video evidence directly contradicts Mr. Williams' account and other inmates' accounts of the events of August 8, 2020. The video consists of clips from two angles, one shows a view of the general population dayroom, the stairwell, and the fire door. The other shows the officer's desk in the dayroom. In clip one, when Mr. Williams' cell door opens, he immediately runs across the dayroom and into the wall next to the microwave. His gait appears off balance, and he nearly stumbles forward. He is moving his arms up and around his head and mid-section and proceeds out of this angle's view. Dkt. 86 at 22:13 to 22:27.

In clip 2, Mr. Williams approaches Officer Tovar at the officer's desk which is partitioned off with yellow tape. As he approaches, he is rapidly moving his arms. Officer Tovar stands up to speak to Mr. Williams. At first, Mr. Williams is behind the yellow tape. He continues to make rapid movements, including gesturing with his arms, touching the top of his head, and shuffling back and forth. At times, it appears his arms cross over the yellow tape. Mr. Williams ultimately crosses the yellow tape and grabs Officer Tovar's hat from his head. When he quickly steps back, he again is off balance and trips over the tape and a large bucket that falls over. Mr. Williams, nearly falling himself, and still in possession of the hat, tries to recover his balance spinning around, and he quickly moves out of camera view. Officer Tovar follows him calmly and appears

to signal for back-up as he continues to saunter in the direction Mr. Williams had gone. Sgt. Roark enters from the door behind the officer's desk to assist. *Id.* at 22:27 to 23:54.

Back to clip 1, Mr. Williams jumps on and off a bench and continues across the dayroom with Officer Tovar's hat and ends up under the stairwell near the fire door. *Id.* at 23:47. Officer Tovar points out to Sgt. Roark where Mr. Williams is located, and the two walk toward him. *Id.* at 24:02 to 24:13. Sgts. Leffler, R. Brewer, and Ashba enter through the fire door. *Id.* at 24:13 to 24:16. Mr. Williams takes a fighting stance, bobs and weaves back and forth with clenched fists, and is seen charging and swinging at the officers. *Id.* at 24:16 and 24:21. Sgt. Roark appears to initially deploy the taser, and the video shows Mr. Williams' reaction as he falls down the wall and briefly to the ground. *Id.* at 24:21 and 24:24. While it is hard to see in the crowd, Mr. Williams is not continuously on the ground, but gets up, continues to struggle, and goes forward through the fire door. *Id.* at 24:30. The officers file out the door, and Officer Tovar picks his hat up from off the ground and ambles back across the dayroom with one of the other officers; the other officer after a few feet then turning back to exit through and close the fire door behind him. The door had remained open for about 25 seconds after Mr. Williams had gone through it, with an officer standing in front of it at one point, and by the end of clip 1, all officers, except Officer Tovar, have exited through the now closed fire door. *Id.* at 25:15. The video does not capture what happened after the parties exited the fire door.

### C. Decontamination Procedures After Use of Force Incident—*Defendant Drogich*

Sgt. Drogich was working in the SCU and was not involved in the use of force events on August 8, 2020. Dkt. 78-4, ¶ 5 (Drogich Affidavit). After the incident, Mr. Williams was escorted to the SCU where he received a new jumpsuit and set of clothes and was housed in a cell there. *Id.*, ¶¶ 6-8. Sgt. Drogich attests that he never had a conversation that evening with Mr. Williams

about the use of O.C. spray or a decontamination shower, and that while he observed Mr. Williams in the SCU, he did "not recall him appearing to need a decontamination shower." *Id.*, ¶ 9-10. Sgt. Drogich disputes Mr. Williams' allegations that he told him: "We do not do showers until Monday. That's what happens when you assault staff." *Id.*, ¶ 11.

### D. Assistant Shift Supervisor and Shift Supervisor—*Defendants Lundy and E. Brewer*

At all times relevant to Mr. Williams' claims, Jacob Lundy was a lieutenant at Wabash Valley, specifically he was the assistant shift supervisor. Dkt. 78-6, ¶¶ 4-5 (Lundy Affidavit). This role involved Lt. Lundy "assigning staff to shifts and handling the administrative response after emergencies," and does "not include directly responding to emergencies or training those who directly responded to emergencies." *Id.*, ¶ 5. Lt. Lundy attests that his only involvement in the August 8, 2020, incident was that he was present when Mr. Williams was placed on the gurney during his transport to the infirmary. *Id.*, ¶ 6.

At all times relevant to Mr. Williams' claims, Eric Brewer was a captain at Wabash Valley, specifically he was the shift supervisor. Dkt. 78-7, ¶¶ 2-5 (E. Brewer Affidavit). This role involved Capt. E. Brewer "overseeing the work of the assistant shift supervisor," in an administrative capacity that "included ensuring there was proper staffing and managing documentation." *Id.*, ¶ 5. Capt. E. Brewer's duties "did not include directly responding to emergencies or training those who directly responded to emergencies." *Id.*, ¶ 6. Capt. E. Brewer attests that he did not remember the incident or the plaintiff, and he was not at the facility on August 8 or 9, 2020, due to being on vacation. *Id.*, ¶ 8. He attests he has never condoned the use of excessive force against Mr. Williams or other inmates. *Id.*, ¶ 9. The Court notes that the docket for this action contains Mr. Williams' formal Grievance No. 116615 about the August 8, 2020, events which reflects that Capt. E. Brewer

responded to the Grievance Specialist recounting a summary of the video and the responding officers' accounts of the events. Dkt. 41-5 at 7.

## IV. Discussion

Mr. Williams claims that Officer Tovar, and Sgts. Daniel Roark, Timothy Leffler, Jordan Ashba, and Randall Brewer subjected him to excessive force in violation of his Eighth Amendment rights, and that these officers assaulted and battered him in violation of state law. Dkt. 15. In addition, Lt. Lundy and Capt. E. Brewer are allegedly liable for failing to train the officers that subdued him. *Id.* Finally, Mr. Williams' state-law negligence claim proceeds against Sgt. Drogich[10] based on Mr. Williams' allegations that Mr. Williams was denied a decontamination shower. *Id.*

### A. Eighth Amendment Excessive Force Claims

The "unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citation and quotation marks omitted). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citation and quotation marks omitted); *see Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam).

---

[10] **The clerk is directed to update the docket** to reflect that the correct spelling of this defendant's name is Michael "Drogich." Dkt. 79 at 1.

Further, as it relates to Sgt. Drogich, the Court notes that the Eighth Amendment deliberate indifference claim against him, based on Mr. Williams' allegations that Sgt. Drogich denied Mr. Williams a decontamination shower was dismissed without prejudice based on the plaintiff's failure to exhaust this claim. *See* dkt. 47 (Order granting Sgt. Drogich's unopposed partial motion for summary judgment on exhaustion). "The state law negligence claim against him continues to proceed in this action." *Id.* Though the state defendants brief their arguments related to the Eighth Amendment deliberate claim against Sgt. Drogich in their summary judgment motion, the Court need not revisit this claim that was previously dismissed without prejudice at docket 47.

To evaluate this question, the Court weighs "several factors, such as 'the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate.'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022) (quoting *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004)). "A *de minimus* application of force is insufficient to support an Eighth Amendment excessive force claim; instead, the force must be repugnant to the conscience of mankind." *Stockton*, 44 F.4th at 619 (internal quotation and citation omitted). Additionally, to survive summary judgment, Mr. Williams "must present evidence supporting a 'reliable inference of wantonness in the infliction of pain.'" *Id.* (citing *Whitley*, 475 U.S. at 322).

### 1. Defendant Tovar

During his deposition, Mr. Williams admitted he did not have an excessive force claim against Officer Tovar.[11] Dkt. 78-10 at 72. The state defendants argue that in Mr. Williams' response in opposition, he does not designate any evidence to rebut this admission in his deposition. Dkt. 95 at 4. In any event, the Court's review of the relevant video indicates that Officer Tovar was not involved in any use of force administered against Mr. Williams. Dkt. 86. Officer Tovar did not engage in any use of force when Mr. Williams approached him at the officer's desk and took his

---

[11] Q: But you're saying on the record now that Officer Tovar did not use excessive force against you; that's not your claim?

A: Failure to prevent. He knew that I needed medical help, and for him—he did not call the right signal and for failure to prevent or intervene.

Q: Those are your claims against Tovar, but not excessive force.

A: Not excessive force.

*See* dkt. 78-10 at 71-72.

hat from his head. Officer Tovar initiated the Signal 10, and the video depicts that once Sgt. Roark

arrived, Officer Tovar walked toward him to point to where Mr. Williams was located underneath

the stairwell near the fire door, as the other officers entered through the fire door. While Officer

Tovar can be seen among the officers responding, he stands back from them, does not appear to

be operating the taser or using O.C. spray, and does not go through the fire door when the situation

moves outside. He is seen simply picking up the hat that Mr. Williams had taken from him and

walking away from the fire door across the floor back towards his post.

Mr. Williams has designated no evidence to support any alternate interpretation of Officer

Tovar's actions, and the Court cannot identify any. *See Marcure v. Lynn*, 992 F.3d 625, 631 (7th

Cir. 2021) ("Rule 56 imposes an affirmative obligation on a movant that we cannot ignore merely

because a nonmovant provides no responsive arguments."). "[I]ndividual liability under § 1983 . .

. requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of

Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v.

Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on

personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action

unless he caused or participated in an alleged constitutional deprivation . . . . A causal connection,

or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

Mr. Williams' arguments that Officer Tovar is liable because he failed to use the correct

signal and failed to prevent and intervene in the use of force and for negligence, fail. Dkt. 78-10

at 71-73; dkt. 90 at 2, 4 (arguments raised in plaintiff's response). First, Mr. Williams' belief that

Officer Tovar could have or should have responded to the circumstances in a different manner by

initiating some different type of call, does not establish a constitutional violation, and certainly

does not establish that he participated in excessive force. Second, the Court screened an Eighth

Amendment excessive force claim to proceed against Officer Tovar and a state-law claim of assault and battery. Dkt. 15 at 4. The Court did not construe Mr. Williams' claims against Officer Tovar to be one of failure to protect or intervene or of negligence, and Mr. Williams did not move the Court to reconsider its screening order. Nor did he move to amend his complaint to develop any such claims. Dkt. 52 (amended pleadings due by Dec. 16, 2022). "A claim raised for the first time in response to a motion for summary judgment is not properly before the Court." *Stevens v. Housing Auth. Of S. Bend*, 720 F. Supp. 2d 1013, 1032 (N.D. Ind. June 23, 2010) (citing *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 679 (7th Cir. 2005)). Therefore, the Court need consider these claims no further.

Because no reasonable juror could find that Officer Tovar was personally liable for using excessive force on Mr. Williams on August 8, 2020, he is entitled to summary judgment on this claim.

### 2. Defendants Roark, Leffler, Ashba, R. Brewer

The August 8, 2020, incident undisputedly involved the use of a taser and O.C. spray, administered by Sgts. Roark, Leffler, and Ashba.[12] "With respect to the taser gun, courts have held

---

[12] Mr. Williams does not explicitly contend that administration of Narcan was excessive force, rather he alleges that "whatever the defendant [Nurse Taggart] advised was inadequate because the plaintiff continued to behave out of the ordinary," and that Narcan was not necessary because he was not under the influence. Dkt. 1 at 7; dkt. 90 at 8. But, it is undisputed that Mr. Williams has no recollection of any administration of the Narcan, such that he can claim Sgt. Ashba's administration of the single dose he gave was done with excessive force. While Mr. Williams may dispute the actual cause of his symptoms, the record indicates Mr. Williams appeared intoxicated, or even high on something, and Mr. Williams does not have the requisite medical knowledge to determine whether administration of Narcan was appropriate. The Court finds, based on these facts, administration of Narcan was a judgment call done in a good faith effort to respond to Mr. Williams' presenting circumstances.

Related to administration of Narcan itself, *see, e.g., McFall v. Bass*, No. 3:20-cv-973-DRL, 2023 WL 2241432, at *2 (N.D. Ind. Feb. 24, 2023), where "[t]he prison has a legitimate interest in reducing the number of opioid-related deaths in prison, and the prison directive to administer Narcan if there are signs of opioid intoxication even if there is doubt about the actual source of intoxication is reasonably related to that legitimate interest," and further, custody staff could rely on the judgment of medical staff that Narcan

that use of a taser gun is not excessive force if its use was prompted by a prisoner's physical resistance." *Vasquez v. Raemisch*, 480 F. Supp. 2d 1120, 1133 (W.D. Wis. Mar. 15, 2007) (collecting cases). The Seventh Circuit has reasoned that although use of the taser "rises above the inconsequential and into the constitutional realm, we reiterate an obvious point: simply because a taser gun's use is more than *de minimis* force does little, if anything, to alter its appropriate use within our detention system." *Lewis v. Downey*, 581 F.3d 467, 475-76 (7th Cir. 2009) (citing *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) (finding a taser's use more than *de minimis* only "if inflicted without legitimate reason")). "We remain cognizant of the important role that non-lethal, hands-off means—including taser guns—play in maintaining discipline and order within detention facilities." *Lewis*, 581 F.3d at 476. Additionally, the Seventh Circuit has held that "the use of mace is appropriate when reasonably necessary to subdue recalcitrant prisoners." *Id.* (internal quotation omitted). When assessing whether force is necessary, the Court considers "the threat to the safety of the officers and the threat to the maintenance of good order and discipline in the institution." *Id.*

### a. Need for Use of Force

Mr. Williams attests that he was seeking medical treatment from Officer Tovar, panicked, and took his hat. Dkt. 91-1, ¶ 2-3. He attests that "[o]ther guards came and used excessive force while [he] was restrained and cuffed causing lacerations to [my] wrist, head trauma, and a hole in [my] tongue due to having a mild seizure. [He] passed out and experience[ed] short term memory loss." *Id.* But the videos of the events in the dayroom depict a different story. Mr. Williams admitted drinking earlier that day, and other evidence in the officers' testimony, the medical record, and the undisputed use of Narcan, indicate that Mr. Williams was also on some substance.

---

was appropriate. *Id.* (summary judgment granted in favor of defendants where plaintiff who was suspected of intoxication argued he had a right to refuse treatment of Narcan).

Consistent with this evidence of intoxication, the video shows he started a disturbance by running out of his cell, moving rapidly around off balance and nearly falling, taking an article of clothing from Officer Tovar's person after he crossed the barrier to the officer's desk, and then moved under the stairwell until responding officers arrived, where he met them with aggression, and they administered force in effort to subdue him. At no point inside the dayroom and in view of the camera, was Mr. Williams restrained and cuffed. The video shows Mr. Williams charging the responding officers, taking a fighting stance, bobbing, weaving, and swinging at them. There is also evidence in the record, inclusive of the officers' testimony and Mr. Williams' guilty plea to battery in his state criminal case, that he struck Sgt. Leffler in the head causing a laceration at this time.[13] The Court finds that the responding officers had a reasonable perception of a threat to institutional safety and security to themselves, and to the other inmates during the recreation period where those inmates were out of their cells. The video also indicates that even after the taser was deployed, Mr. Williams briefly fell but got back up and continued to resist, corroborating the officers' testimony that additional amounts of force were needed: administration of O.C. spray and re-energizing of the taser. Thus, the Court finds that the force continuum that was deployed was necessary to resolve the situation.

---

[13] Mr. Williams' declaration from another inmate that heard Sgt. Leffler say to Williams that Williams didn't strike him but only lunged at him, is not persuasive and does not create a genuine issue of material fact. The video shows Mr. Williams lunging and swinging at officers such that the use of force became necessary, and the relevant state court record indicates that Mr. Williams pled guilty to battering Sgt. Leffler during the incident.

Any allegations Mr. Williams makes about an interaction he had with Sgt. Leffler on January 14, 2020, well before this incident, are not relevant here. Dkt. 90 at 7 (arguments in plaintiff's response brief). In addition, Mr. Williams' allegations that Sgt. Leffler approached him on August 11, 2020, *three days after the incident* "making subtle offensive remarks to the course of events and how Plaintiff would pay dearly for breaking his Oakley glasses" do not create a material fact issue related to use of force during the instant incident. The video depicts Mr. Williams' conduct, and Mr. Williams' own testimony was that he does not remember hitting Sgt. Leffler, or much, if any, of Sgt. Leffler's role in the incident.

*b. Amount of Force*

The officers' testimony and the video indicate that Mr. Williams continued to resist after the taser was deployed the first time. Mr. Williams does not dispute that he got back up, rather, he disputes that he was combative. But, again, the video shows that he was still engaged in a struggle and was not restrained. While Mr. Williams contends that Sgts. Leffler and Ashba used large cans of mace and that he was soaked with chemical spray, he has designated no evidence other than those comments he made in his deposition testimony, to contradict the officers' testimony that they each applied one-second bursts of O.C. spray. While the video is unclear on the quantity or duration of the use of O.C. spray, Mr. Williams testified that this was the first time he had ever been exposed to a chemical agent, and he has not provided evidence regarding what quantity of chemical agent was used,[14] nor does he suggest that he had personal knowledge of such information. Dkt. 78-10 at 103. As the Court has explained, Mr. Williams' recollection of the events, as shown by his own testimony, documents, and exhibits in the record, is grossly inconsistent. There is little to no evidence of what he actually remembers about the events that led to him being tased and maced.

Further, Mr. Williams does not dispute that after deployment of the taser and administration of whatever amount of O.C. spray, that he lunged at Sgt. R. Brewer, this time tearing the lapel of

---

[14] In his response in opposition on this point, Mr. Williams cited to another inmate's declaration that stated Mr. Williams was tased and sprayed "when it was an isolated incident that turned into an offender getting tased twice and sprayed. The last taser shot hit him and Williams fell outside out the door head hit concrete then his body dropped. He was unresponsive and still the c/o's kept treating him like he was steadily resisting." Dkt. 91 at 21 (cleaned up). But, this declaration does not indicate evidence of the quantity or duration of the use of O.C. spray, or that O.C. spray was even used after contending that Mr. Williams was unresponsive. Further, this declaration, like the other inmates' declarations, is contradicted by the video of the footage inside the dayroom which shows that Mr. Williams was not unresponsive and continued to actively resist officers. Even assuming the inmate declarant could have seen any of the events that happened once Mr. Williams and the officers were outside the fire door, the declaration does not contradict the other evidence of record. Rather, it is consistent with the officers' testimony and the extent of injuries sustained.

his shirt where his radio was attached and continued to resist, such that Sgt. Roark, out of safety and concern for officers, reenergized the taser outside the fire door to gain compliance. *See, e.g.*, *Sanders v. Fredricks*, No. 10 C 5714, 2016 WL 8711472, at *6 (N.D. Ill. Jan. 8, 2016) (Plaintiff "failed to demonstrate that the amount of pepper spray used was unnecessary or excessive" because he bent and damaged his restraints. "It then took two additional correctional officers along with a second set of handcuffs to restrain" plaintiff because he "was not incapacitated, or even slowed down much, by the pepper spray and thus . . . use of pepper spray appears to have been *de minimus* given the totality of circumstances[.]"). The Court finds, therefore, that the amount of force used to subdue a recalcitrant and hyped-up Mr. Williams under these circumstances was appropriate.

### c. Effort Made to Temper the Severity of the Force

The officers' testimony and Mr. Williams' own evidence, documents, and exhibits indicate that he was given multiple verbal orders to relax, calm down, and comply with the officers. Mr. Williams' lack of memory of if those orders occurred, when they occurred, or what they were, do not create a genuine issue of material fact. Indeed, Mr. Williams' own witness statements include that he was not doing what officers were telling him to do. *See* dkt. 91-1 at 25 ("They ended up ta[s]ing him because he wasn't doing what they asked."). The video also shows that the officers did not resort to immediate use of force. Rather, when Mr. Williams took Officer Tovar's hat, he signaled for back-up and waited for help to arrive and pointed out where Mr. Williams was located under the stairwell. The video supports that responding officers did not administer force *until after* Mr. Williams charged and lunged at them and began swinging his arms, and continued force was used when the first attempt to subdue him failed.

Simply put, it is hard to imagine what the officers could have done to temper the use of force when met with Mr. Williams' conduct. *See, e.g.*, *Weeks v. Warden*, No. 15 C 5234, 2017 WL

3404965, at *8 (N.D. Ill. Aug. 7, 2017) (Plaintiff involved in fight with another inmate argued that sergeant failed to give him proper warning before deployment of pepper spray. "But even accepting Plaintiff's account it is unclear why a warning would be needed in this situation. It was not as if Plaintiff was engaging in some innocuous pursuit when the pepper spray was used, such that he would have been surprised by the spray. Instead, he was engaging in behavior that violated prison rules and posed an obvious threat to other inmates and staff.").

### d. Extent of Injury

It is undisputed that Mr. Williams does not know how he received the injuries to his face, and that he did not tell Sgt. R. Brewer that the mechanical restraints that were placed on him were too tight. Mr. Williams' injuries of a laceration and redness to his eye, biting his own tongue, and an abrasion on his cheek were documented during his assessment immediately after the use of force, and though, he states he suffered blunt force head trauma, chest pain, memory loss, and nerve damage, Mr. Williams has not designated evidence that he has ongoing or chronic conditions related to this incident.[15] Dkt. 90; dkt. 91-1. But even if he had, Mr. Williams has no medical training or expertise and cannot offer his opinions about medical causation. *See* Fed. R. Evid. 701; *Joseph v. Lowe's Home Ctr., Inc.*, No. 1:13-cv-01267-TWP-DML, 2014 WL 12538130, at *3-5 (S.D. Ind. Dec. 23, 2014) ("A causal connection between a permanent condition, an injury, and a pre-existing injury or condition is a complicated medical question."). While the use of force inflicted a degree of pain, scratches, lacerations, and burning sensations from chemical spray,

---

[15] The Court notes that Mr. Williams' exhibits include an August 25, 2021, medical record related to monitoring of his glucose, and a radiology record from February 2023 related to a "comminuted fracture distal ulnar diaphysis," related to his "ulnar pain" from a "lifting injury." Dkt. 94-1 at 32-33. Mr. Williams has not explained how either of these medical records, occurring well after the August 8, 2020 incident, relate to said incident or any of the documented injuries he sustained from it.

Mr. Williams has not designated evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

Considering all the factors discussed above, no reasonable jury could conclude that Sgt. Roark's initial deployment of the taser inside the dayroom and reenergizing the taser outside the fire door was done to inflict unnecessary and wanton pain and suffering. Instead, the designated evidence shows that the taser was applied and reenergized in a good-faith effort to gain Mr. Williams' compliance. Likewise, the designated evidence shows that the O.C. spray administered by Sgts. Leffler and Ashba was not done to inflict unnecessary and wanton pain and suffering but was applied in a good-faith effort to gain Mr. Williams' compliance after the initial taser was ineffective in subduing him, and he continued to struggle with officers.

### e. Other Events Outside

Mr. Williams also claims that Sgts. Roark, Leffler, and R. Brewer used excessive force outside the cell house and out of range of the cameras, and that he was beaten and choked out to the point of unconsciousness while he was cuffed. Dkt. 90 at 3. He believes Sgts. R. Brewer or Ashba struck him, and Ashba administered Narcan. *Id.* He also disputes that he lunged out of the wheelchair and states he was pushed or dumped out of the wheelchair. *Id.* at 4. There is no evidence in the record, besides Mr. Williams' own statements, to support his version of these events. Mr. Williams' submitted inmate declarations do not show how these inmates had personal knowledge of events that occurred outside of the dayroom, and more specifically outside the fire door, especially after it closed, and the Court cannot construe that they did based on review of the video.

As the Court has thoroughly outlined, Mr. Williams' own deposition testimony, documents, and exhibits, brim with statements he has made of his inability to remember what happened on

August 8, 2020. *See, e.g.*, *Valance v. Wisel*, 110 F.3d 1269, 1276 (7th Cir. 1997) (Summary judgment granted for defendant on claim that traffic stop was pretextual in case where plaintiff shared with defendant he didn't know whether he crossed center line, but at deposition conveyed he didn't believe he crossed the center line. "Valance's less than definitive knowledge does not cast sufficient doubt on what that officer reasonably believed at that time . . . . Furthermore, Valance's current belief is somewhat inconsistent with the statements he made to [defendant] at the time of the stop . . . . We think a reasonable jury could only take from all of this that Valence really does not know one way or the other. Thus, his evidence does not rebut that proffered by the officer."). Even further, to defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Mr. Williams has not produced more than a scintilla of evidence that he remembers any of the events at all, let alone those he claims to have occurred outside. The record illustrates that he admitted using alcohol, that he denied personal knowledge of events that occurred on August 8, 2020, in his grievances, and further, that he does not remember how he got his injuries. Nor, has he designated any evidence to support his contention that he suffered from head trauma or any memory loss.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." *Scott*, 550 U.S. at 378. "This is true even when certain portions of videotape evidence are inconclusive and the parties present different versions of the events." *McBride v. Lueneburg*, No. 22-cv-462-bhl, 2023 WL 4595511, at *3 (E.D. Wis. July 18, 2023) (citing *Boyd v. Pollard*, 621 F. App'x 352, 355-56 (7th Cir. 2015)). "Further, as the Seventh Circuit has held, even when certain portions of videotape evidence are missing, the

remainder of the video can still establish that no reasonable jury could credit a plaintiff's version of events." *Id.* (citing *Boyd*, 621 F. App'x at 355-56). The Court must "consider [the plaintiff's] allegations in combination with the undisputed facts and assess whether a jury viewing all these facts could reasonably find" that excessive force was used on him. *See Everroad v. Galipeau*, No. 3:20-CV-488-JD-MGG, 2021 WL 2105328, at *4 (N.D. Ind. May 25, 2021) (citing *Boyd*, 621 F. App'x at 355-56)).

While the Court does not have the benefit of video footage once Mr. Williams stumbled out the fire door, the initial sequence of events that is viewable is inconsistent with Mr. Williams' assertions about the officers' behavior outside. *See, e.g.*, *Boyd*, 621 F. App'x at 355-56 (Plaintiff argued guards used excessive force during a cell extraction when they body-slammed him onto a concrete floor, placed him in a chokehold, and hit him in the face and head. "Boyd argues that there are disputed facts about what happened when he suddenly dropped to the ground after the group arrived in the new wing of segregation and what occurred inside the new cell, events that were not captured on camera. And if a jury believes his version, Boyd continues, it reasonably could find that Beahm used excessive force. We disagree."). In *Boyd*, the Seventh Circuit acknowledged that initially it could appear as though this fact dispute would preclude summary judgment, but summary judgment is improper "only if a jury reasonably could find excessive force based on Boyd's assertions." *Id.* at 356. The Seventh Circuit reasoned:

> We conclude that no juror who viewed the video could reasonably conclude—given the professional behavior of the guard and minor injury by Boyd—that the guards, when outside the camera's view, attacked Boyd. For instance, Boyd asserts that he was body slammed onto a concrete floor and sustained numerous blows to his head and face so severe as to cause blood to drip down his face. But Boyd's injury—a small laceration above his eye—was minimal and cannot even be seen bleeding. If Boyd's account was accurate, that minor cut would not have been his sole injury.

*Id.* Additional cases have cited to the ruling in Boyd involving similar circumstances.[16] Also inconsistent with Mr. Williams' assertions, but consistent with the rest of the record, is the declaration submitted on his behalf by the prisoner who noted "it was an isolated incident that turned into an offender getting tased twice and sprayed. The last taser shot hit him and Williams fell outside out the door head hit concrete then his body dropped. He was unresponsive and still the c/o's kept treating him like he was steadily resisting." Dkt. 91 at 21 (cleaned up). Not only does this declaration fail to mention any punching, kicking, beating, or choking of Mr. Williams by the officers, it merely repeats the undisputed tasing and falling, all of which, along with the cuffing, are consistent with the other evidence including the injuries of which Mr. Williams complains.

Moreover, the Court notes that Mr. Williams admits in his response in opposition that he believed that administration of the Narcan, which occurred for the first time *outside* the fire door and outside the camera view, "was inadequate," because he "continued to behave out of the ordinary (kicking his legs,)" which illustrates he continued to meet the officers with further resistance. *See* dkt. 90 at 4.

Accordingly, given the calm and professional behavior of the officers in the relevant video, the Court's determination that the events inside the dayroom did not constitute excessive force, Mr. Williams' minor injuries not being indicative of being beaten to the point of unconsciousness, and Mr. Williams' inconsistent recollection of the events on August 8, 2020, no reasonable juror could conclude that Sgts. Roark, Leffler, E. Brewer, or Ashba used more than the force reasonably

---

[16] *See, e.g.*, *DaSilva v. Demers*, No. 19-C-825, 2021 WL 1979340, at *5 (E.D. Wis. May 18, 2021) ("The video clearly shows that the defendants acted professionally throughout the escort . . . . No reasonable jury could credit DeSilva's version of what happened and find in his favor."); *Jenkins v. Miller*, No. 17-cv-25-bbc, 2018 WL 6788527, at *6 (W.D. Wis. Dec. 26, 2018) ("Apart from his vague allegation of being punched, plaintiff has not presented evidence to corroborate his contention that defendants intended to cause him harm. Viewing the video makes it clear that correctional officers acted in a calm and professional manner throughout.").

necessary to gain his compliance and restore order to the facility. Thus, these state defendants are entitled to summary judgment on Mr. Williams' Eighth Amendment excessive force claims.

### B. Failure to Train Claims Against Defendants Lundy and E. Brewer

The state defendants make three arguments about why Lt. Lundy and Capt. E. Brewer are entitled to summary judgment on Mr. Williams' failure to train claims. Dkt. 79 at 19. The Court finds each of these arguments is persuasive.

First, state defendants correctly argue that any official capacity claims against Lt. Lundy and Capt. E. Brewer are barred by the Eleventh Amendment. *Id.* "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. Every state defendant is employed by the IDOC. The Eleventh Amendment bars private lawsuits for damages in federal court against a state that has not consented. *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005), and "[a]n agency of the state"—like the IDOC—"enjoys the same immunity," *Nunez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016).

Second, these claims are unsuccessful "because failure to train claims are usually maintained against municipalities [or corporations], not against individuals, and in the Eighth Amendment context, such claims may only be maintained against a municipality [or corporation]." *Brown v. Budz*, 398 F.3d 904, 918 (7th Cir. 2005) (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 739-40 (7th Cir. 2001)); *see also Taylor v. Zatecky*, No. 1:20-cv-02413-JPH-MPB, 2023 WL 2683115, at *15 (S.D. Ind. Mar. 28, 2023) (failure to train claims related to managing mental health inmates dismissed at summary judgment for same reason).

30

Third, the state defendants argue that Lt. Lundy and Capt. E. Brewer lacked sufficient personal involvement in the August 8, 2020 events. The Court agrees. There is no *respondeat superior*, or vicarious liability in § 1983 actions. *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "[T]o recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of *respondeat superior* and must instead allege that the defendant, through his or her own conduct, has violated the Constitution." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Individual liability "may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or 'turn[s] a blind eye' to it." *Id.*

It is undisputed that Capt. E. Brewer was not at the facility that evening, and that he did not use force on Mr. Williams. The record reflects that Capt. E. Brewer responded to Mr. Williams' grievance during his exhaustion of the administrative remedy process, and that response was consistent with the responding officers' account and the video. This occurred *after* the use of force event. Nothing in the record suggests that Capt. E. Brewer knew of unconstitutional conduct and facilitated, approved, condoned, or turned a blind eye to it. "[I]f, upon learning of an inmate's complaints, a prison official reasonably responds to those complaints, he lacks "a sufficiently culpable state of mind" to be deliberately indifferent." *See Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006) (finding grievance counselor did not violate the Eighth Amendment where he researched inmate's complaint, learned that medical professionals had seen and diagnosed inmate with medical condition and determined surgery was not required). Here, Capt. E. Brewer did reasonably respond to the grievance.

Similarly, it is undisputed that Lt. Lundy was present only when Mr. Williams was transported on a gurney to the infirmary, and while he was in the infirmary, events *after* the use of force. It is also undisputed that Lt. Lundy was not personally involved in any force used against

31

Mr. Williams. Mr. Williams' deposition testimony revealed that Lt. Lundy asked him several questions about what had occurred while he was in the infirmary, but this is not evidence that Lt. Lundy knew of unconstitutional conduct and facilitated, approved, condoned, or turned a blind eye to it.[17] Mr. Williams' testimony that Lt. Lundy told him he would not receive a decontamination shower is unpersuasive because even if true, it is undisputed Mr. Williams received a decontamination shower in short order after he was released from the infirmary.

For all of these reasons, Mr. Williams' Eighth Amendment failure to train claims against Lt. Lundy and Capt. E. Brewer fail, and they are entitled to summary judgment in their favor.

### C. State-law Claims

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims when the federal claims have been dismissed. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see also* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . . "). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"While the court's decision is discretionary, when all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over

---

[17] Mr. Williams' arguments that Lt. Lundy asked him why he had to act so out of the ordinary and telling him he would not get any water or a shower because he assaulted officers is unpersuasive. Dkt. 90 at 5. This is not evidence that Lt. Lundy was personally involved in any use of force, and Mr. Williams undisputedly received medical treatment in the infirmary and a decontamination shower as soon as he was stabilized and released from the infirmary.

any supplemental state-law claims." *Petropoulos v. City of Chi.*, 2021 WL 1103480, at \*9 (7th Cir. Mar. 23, 2021) (cleaned up). The presumption may be rebutted (1) if dismissal of the state claim would create problems under the statute of limitations; (2) if the court has "devoted substantial resources to the dispute;" or (3) "if it is easy to resolve the state-law claims." *Id.* (internal citations omitted).

The Court finds no reason to deviate from the usual practice in this case. The statute of limitations will not have run on Mr. Williams' state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). The Court has not expended significant resources on the pending state-law claims, and the Court does not expect that the parties' efforts with respect to those claims in discovery and briefing will go to waste. The evidence and legal research that would have been relevant in a federal case should be every bit as relevant in a state-court proceeding. Finally, as always, comity favors allowing state courts to decide issues of state law.

For these reasons, the Court exercises its discretion to **relinquish supplemental jurisdiction** over Mr. Williams' state-law assault and battery claims against Officer Tovar and Sgts. Roark, Leffler, R. Brewer, and Ashba. The Court exercises its discretion to **relinquish supplemental jurisdiction** over Mr. Williams' state-law negligence claim against Sgt. Drogich.

### V. Conclusion

The state defendants' motion for summary judgment, dkt. [77], is **GRANTED**. All federal claims against Roark, T. Leffler, R. Brewer, J. Ashba, I. Tovar, J. Lundy, and E. Brewer are **dismissed with prejudice**. The federal claim against Michael Drogich is **dismissed without**

prejudice. *See* dkt. 47 (Sept. 26, 2022 Order granting defendant Drogich's unopposed partial motion for summary judgment on exhaustion).

The Court **relinquishes supplemental jurisdiction over all remaining state-law claims against the state defendants.**

Final Judgment consistent with this Order, the Court's Order granting medical defendants' motion for summary judgment, the Court's Order granting defendant Drogich's partial motion for summary judgment on exhaustion, and the Screening Order shall now issue.

The final pretrial conference and trial dates are hereby **VACATED.**

In light of this ruling, the defendants' joint motion to vacate the trial date, dkt. [105], is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Date: ___1/18/2024___

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

OLIVER H. WILLIAMS
945327
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com